## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE | : | Chapter 13 |
| | : | |
| MICHAEL T. VENTRONE, | : | |
| | : | Bankruptcy No. 21-11643-AMC |
| DEBTOR | : | |
| _____ | : | |
| | : | |
| ASHLEY HUNDT, | : | |
| | : | |
| PLAINTIFF, | : | |
| | : | |
| TRUST UNDER WILL OF SHEILA | : | |
| W. HUNDT FOR THE BENEFIT OF | : | |
| ASHLEY HUNDT | : | |
| | : | |
| PLAINTIFF, | : | |
| | : | Adv. Proc. No. 22-00005-AMC |
| | : | Adv. Proc. No. 22-00026-AMC |
| V. | : | |
| | : | |
| MICHAEL T. VENTRONE, | : | |
| | : | |
| DEFENDANT | : | |
| _____ | : | |

Ashely M. Chan, United States Bankruptcy Judge

## OPINION

### I.      INTRODUCTION

In this adversary proceeding, Ashley Hundt ("Plaintiff" or "Hundt") and the Trust under

Will of Sheila W. Hundt for the Benefit of Ashley Hundt ("Trust," collectively with Hundt,

"Plaintiffs") move for summary judgment, arguing that certain undisputed material facts

establish that the obligation of Hundt's ex-husband, Michael T. Ventrone ("Debtor"), to

repay the Trust, of which Hundt is the beneficiary, pursuant to a property settlement

agreement executed in connection with their divorce, is non-dischargeable pursuant to one or

more subsections of 11 U.S.C. § 523(a), including § 523(a)(5) ("Section 523(a)(5)"), which

1

renders certain debts for "domestic support obligations" non-dischargeable. Debtor disputes Plaintiffs' characterization of this debt as a domestic support obligation and argues that, because the debt is payable to the Trust rather than to Hundt directly, the debt cannot be a domestic support obligation pursuant to Section 523(a)(5).

Ultimately, as explained below, the Court agrees with Plaintiffs that the undisputed material facts reflect that this debt constitutes a domestic support obligation under Section 523(a)(5). Therefore, the Court finds that the debt is non-dischargeable as a domestic support obligation pursuant to Section 523(a)(5) in the amount of $118,413.28 plus any additional attorneys' fees which may be awarded in connection with a support and enforcement action brought by Plaintiff against Debtor which has been held in abeyance during the pendency of this bankruptcy, and grants Plaintiffs' motion for summary judgment in part as to Count V.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

On May 25, 2002, Debtor and Plaintiff married. ECF Case No. 22-00005, ECF Case No. 22-00026 ("Adv. ECF")[1] 25, 41 Motion for Summary Judgment of Ashley Hundt and Trust under Will of Sheila W. Hundt ("Mot. for Summ. J.") ¶ 3. On August 9, 2013, Debtor and Plaintiff entered into a post-nuptial agreement ("Post-Nuptial Agreement") to secure sufficient funds for the purchase of their marital residence located at 202 Rivercrest Drive, Phoenixville, PA 19460 ("Property"). *See* Mot. for Summ. J. ¶ 3. The Post-Nuptial Agreement, in relevant part, provides that:

> [Plaintiff] and [Debtor] intend to purchase the real property located at 202 Rivercrest Drive, Phoenixville, PA 19460 (herein the "Property"). [Plaintiff] intends to provide a down payment for the purchase of the Property with a distribution in the amount of Four Hundred Fifteen Thousand Dollars ($415,000)

---

[1] Because the Court consolidated these cases on June 8, 2022, *see* Adv. ECF 11, 15 Consolidation Order, the Opinion's citations reference both proceedings.

to be distributed to [Plaintiff] individually from the Trust … [Plaintiff] and [Debtor] intend to purchase the remainder of the Property with proceeds from one or more mortgages against the Property.

In the event of a separation, divorce, annulment, or dissolution of marriage for any reason, the original Distribution invested in the Property of $415,000, along with ½ of any and all future income derived from the Distribution invested in the Property, ½ of any investments, exchanges, and/or increase in value of the Distribution invested in the Property, shall be returned to the Trust at the time of sale, free and clear from any and all claims by [Debtor]. In the event of a separation, divorce, annulment, or dissolution of marriage for any reason, [Debtor] agrees to execute any and all documents, including any Deeds or ancillary transfer documents, necessary to effectuate the transfer of Distribution invested in the Property to the Trust.

*See* Mot. for Summ. J., Ex. A ("Post-Nuptial Agreement") ¶¶ 2–3.

Pursuant to the Post-Nuptial Agreement, Plaintiff used a $415,000 distribution (hereinafter referred to as "Distribution") from the Trust as a down payment to purchase the Property. *See* Mot. for Summ. J. ¶ 3. *See also* Post-Nuptial Agreement ¶ 2. The financial disclosures attached to the Post-Nuptial Agreement indicate that Debtor and Plaintiff held most of their marital assets and liabilities jointly. Separately, Debtor held a GSK Pension, CHE 401K, Apollo 401K, Apollo ESP, and a student loan;[2] however, Plaintiff personally had no assets or liabilities. *See* Post-Nuptial Agreement ¶¶ 5–9.

On July 15, 2016, Debtor filed for divorce from Plaintiff in the Court of Common Pleas of Montgomery County ("Family Court"). *See* Mot. for Summ. J. ¶ 5. On December 22, 2016, the parties voluntarily entered into a property settlement agreement ("PSA") as part of their divorce action, *see id.*, which substantively incorporated the Post-Nuptial Agreement under Paragraph 12(B). Mot. for Summ J., Ex. B ("PSA") ¶ 1. The parties' divorce decree,

---

[2] Debtor's four personal assets were valued collectively at $14,100, and his student loan liability was valued at $26,700. *See* Post-Nuptial Agreement ¶ 6.

entered March 24, 2017 ("Divorce Decree"), substantively incorporated the PSA.  *See* Mot.

for Summ. J., Ex. C ("Divorce Decree").  The PSA, in relevant part, provides:

Section 12. ASSETS AND LIABILITIES

A.  202 RIVERCREST DRIVE, PHOENIXVILLE PENNSYLVANIA.

> The parties acquired 202 Rivercrest Drive, Phoenixville, Pennsylvania in August
> 2013.  The parties utilized the funds distributed to them from [Plaintiff's] [T]rust
> along with a mortgage to acquire the [P]roperty.  There is also a line of credit
> associated with the [P]roperty.  The total debt, at or around the time of the
> Execution Date, secured by the Marital Residence is $893,901.60, allocated as the
> mortgage ($404,659.30); line of credit ($74,242.30), and; the distribution from the
> Trust ($415,000.00).

*See* PSA ¶ 7.

> Upon the sale of the Marital Residence, $415,000.00 of any net proceeds ("net
> proceeds" are defined as the gross sale proceeds less real estate taxes and
> commissions, less the mortgage, less the line of credit, and less any standard fees
> and costs associated with settlement) less [Debtor's] $1,000.00 per month cash
> payment timely payments of the mortgage shall be immediately distributed to the
> Trust [ … ] in conformity with the terms of the parties' August 9, 2013 Post-
> Nuptial Agreement, plus, if applicable, 50% of "any future income derived from
> the Distribution invested in the Property, ½ of any investments, exchanges, and/or
> increase in value of the Distribution invested in the Property, shall be returned to
> the Trust at the time of sale, free and clear from any and all claims by" [Debtor].

*See* PSA ¶ 8.

> The Trust shall be identified on the HUD-1 settlement sheet and the parties shall
> instruct the title agent or realtor to have check issued in the amount of
> $415,000.00 directly to the Trust.  The parties further recognize that the
> $415,000.00 is a marital debt to the Trust for which [Plaintiff] is a beneficiary.  In
> the event the net sale proceeds are not at least $415,000.00 the Trust shall receive
> 100% of the net sale proceeds with the balance between $415,000.00 and the net
> sale proceeds being addressed as a marital debt as set forth in detail below.

*See* PSA ¶¶ 8–9.

> Neither party shall act in any way to individually or jointly encumber the Marital
> Residence.  To the extent that the debt on the Marital Residence (i.e. the line of
> credit) decreases pending the sale of the Marital Residence, neither party shall
> utilize the line of credit in excess of a $75,000 balance which existed as of the
> date of filing of the divorce complaint.  Either party utilizing the line of credit,

shall notify the other of the expense being paid.  Neither party shall encumber or leverage any available equity in the Marital Residence.

*See* PSA ¶ 9.

B.  <u>POST-NUPTIAL AGREEMENT DEBT OBLIGATION TO TRUST.</u>

The parties executed a Post-Nuptial Agreement on August 9, 2013, whereby they received a $415,000.00 distribution from the Trust Under Will of Sheila W. Hundt ("Trust") for which [Plaintiff] is a beneficiary.  The parties acknowledge and agree that by accepting these funds they created a marital debt to the Trust which is subject to equitable distribution.  The parties further acknowledge that as a beneficiary of the Trust, the repayment of the funds will be applied toward [Plaintiff's] support in the future.

The distribution of these funds was contingent upon the return to the Trust of $415,000.00 upon separation/divorce plus fifty percent (50%) of any income, increase in value, investments or exchanges in excess of $415,000.00.  The terms of the Post-Nuptial Agreement are incorporated herein as though set forth at length and the Agreement is attached hereto as Exhibit "B."

*See* PSA ¶ 10.

The parties agree that in the event that the sale of the Marital Residence does not satisfy their $415,000.00 obligation to the Trust, that they shall divide the deficiency between the net sale proceeds returned to the Trust and the $415,000.00 liability with [Debtor] being responsible for 37.5% of the deficiency and [Plaintiff] being responsible for 62.5% of the deficiency.

*See* PSA ¶ 10.

In the event of a deficiency, as set forth above, [Debtor] agrees he shall pay his portion of any deficiency directly to the Trust in the amount of not less than $1,225.00 per month for consecutive months until his portion is satisfied.

*See* PSA ¶ 10.

Thus, Paragraph (B) of Section 12 created Debtor's obligation to repay a portion of the Distribution ("Marital Obligation") if the sale of the Property did not yield sufficient proceeds to repay the entirety of the Distribution at settlement.  *See id.*

The PSA also addresses alimony and child support as follows:

13. <u>ALIMONY/ALIMONY *PENDENTE LITE*/SPOUSAL SUPPORT</u>

> Except as otherwise set forth in Paragraph 14 addressing the payment of household expenses, the parties agree that they each hereby expressly waive, discharge, and release any and all rights and claims which they may now or hereafter have, by reason of the parties' marriage, to alimony, alimony pendente lite, support or maintenance.

*See* PSA ¶ 13.

## 14. CHILD SUPPORT AND HOUSEHOLD EXPENSES

> The parties agree that so long as they are both residing at the Marital Residence, that [Debtor] shall be individually responsible for paying the mortgage, line of credit, all utilities, and all insurances and that [Plaintiff] shall be responsible for paying her and the children's basic necessities, groceries for the household, and household supplies (i.e. cleaning supplies, toilet paper).  [Plaintiff] shall also provide the children's medical insurance.  [Debtor] recognizes that [Plaintiff's] income may not be sufficient to reasonably cover all such expenses, in addition to her individual expenses, and shall provide additional direct financial support by agreement of the parties and at [Plaintiff's] request which shall not be unreasonably refused by [Debtor].

> Upon the parties'sale of the Marital Residence, they agree to utilize income for [Debtor] in the amount of $135,000.00 for 2016 and [Plaintiff's] hourly rate of $16.60.  This provision is without prejudice to any arguments either party may make in future support matters.

> The parties agree that [Plaintiff] shall withdraw her child support and alimony pendente lite action upon execution of this Agreement.  Upon the sale of the Marital Residence or vacating of the property, the parties agree that they shall exchange income information and collaborate to have a guideline Support Order entered.  [Plaintiff] shall be responsible for initiating the support action and having a conference scheduled should they have difficulty resolving support.  The parties agree to exchange their most recent income tax returns plus six months of pay stubs within ten (10) days of the filing of a support action.

*See* PSA ¶¶ 13–14.

The PSA also contains an enforcement provision, which provides:

## 22. ENFORCEMENT

> Any party breaching this Agreement shall be liable to the other party for all costs, including reasonable counsel fees, reasonably incurred by the non-breaching party to enforce his or her rights under this Agreement subsequent to the Execution Date.

*See* PSA ¶ 17.

In December 2018, the Property was sold, and the proceeds were insufficient to fully repay the Distribution to the Trust. *See* Mot. for Summ. J. ¶ 7; Mot. for Summ. J., Ex. M Request for Admissions ¶ 11.

Beginning in January 2019, Debtor failed to make payments under the terms of the PSA on account of the deficiency from the sale of the Property. ECF Case No. 21-11643 ("ECF") Proof of Claim 17, Ex. A ¶ 2. On October 4, 2019, the Family Court entered a contempt order ("October 2019 Contempt Order") against Debtor. Mot. for Summ. J. Exs. C, G ("October 2019 Contempt Order") ¶ 1. The October 2019 Contempt Order required Debtor, *inter alia*, to "pay the [Marital Obligation] arrears in the amount of $12,250.00 as of October 5, 2019[,] at the rate of $775.00 per month on the [fifth] of each month." *See id.* In addition to the arrears due on the Marital Obligation, Debtor was required to "pay the regularly scheduled payments" in the Divorce Decree which "incorporate[ed] the parties' December 22, 2016 [PSA]." *See id.*

On August 11, 2020, the Family Court found Debtor in contempt of the October 2019 Contempt Order and stated, *inter alia*, that Debtor was:

- Ordered to repay $113,913.28 to the Trust, payable according to the schedule provided for in the PSA;

- In contempt of the PSA for withdrawing $6,644.51 from the Debtor and Plaintiff's home line of credit;

- Ordered to repay the Trust $6,644.51 payable in monthly installments of $553.71 each month until paid in full; and

- Ordered to pay attorneys' fees in the amount of $4,500.00 directly to the Trust on or before December 1, 2020.

*See* Mot. for Summ. J. Exs. D, H Order ("August 2020 Contempt Order," collectively with October 2019 Contempt Order, "Contempt Orders") ¶ 1.

On January 21, 2021, the Family Court held a hearing regarding Plaintiff's petition to hold Debtor in contempt and enforce the Contempt Orders and Debtor's failure to comply with his Marital Obligation pursuant to the PSA ("Contempt and Enforcement Hearing"). *See* Mot. for Summ. J. Ex. I ("Contempt Hearing Transcript") ¶¶ 1, 5. During the Contempt and Enforcement Hearing, Debtor testified, *inter alia*, about the Trust and his Marital Obligation. Debtor believed the parties "agreed to the master settlement agreement[3] [sic] rather than alimony; so Ashley waived alimony." Contempt Hearing Transcript ¶ 9. Debtor stated he "offered [Plaintiff] about $120,000 worth of alimony … over ten years or eight years" and he believed that he would pay "[$]120,000 to the trust[,] [] rather than alimony." *See id.* ¶¶ 9–10. Debtor felt that by "pay[ing] the trust fund, [] they, [referring to the Trust], would take care of her and the children." *See id.* ¶ 16.

At the conclusion of the Contempt and Enforcement Hearing, the Family Court ordered Debtor to send one check for $30,625,[4] and three other checks in the amount of $1,225 each, representing the unpaid monthly payments to the Trust for February, March, and April 2021, required by his Marital Obligation, directly to chambers. *See* Contempt Hearing Transcript ¶¶ 54–55. *See also* Mot. for Summ. J., Ex. K ("May 2021 Contempt Order") ¶ 1.

---

[3] The Court noted that "[Debtor] was represented by Deborah Brand when th[e] [PSA] was signed." *See* Contempt Hearing Transcript ¶ 14.
[4] This amount represents Debtor's arrears regarding the Marital Obligation because he had failed to make payments since January 2019. *See* Contempt Hearing Transcript ¶¶ 21–22.

Although Debtor provided all four requested checks to chambers, all the checks contained conditional language.  As such, the Family Court requested that Plaintiff's counsel notify chambers if the checks could not be deposited given this conditional language.  *See* May 2021 Contempt Order ¶¶ 1–2.  In the event the checks could not be deposited due to Debtor's conditional language, the Family Court scheduled a hearing for April 27, 2021, and Debtor was advised to submit replacement checks without the conditional language prior to the hearing which he did not submit.  *See* May 2021 Contempt Order ¶ 2 n. 3.  Plaintiff was unable to deposit the checks due to the conditional language, and Debtor failed to appear at the scheduled hearing to address the issue.  *See* May 2021 Contempt Order at ¶¶ 2–3. Therefore, on April 27, 2021, the Family Court again ordered Debtor to submit replacement checks by the close of business on April 28, 2021, and if Debtor did not, he was ordered to appear before the Family Court on April 30, 2021.  *See id.* ¶ 3.  Debtor again failed to submit replacement checks and failed to appear at the April 30, 2021 hearing.  *See id.*  Consequently, on April 30, 2021, a bench warrant was issued against him.  *See id.*

During a subsequent status hearing in Family Court on May 11, 2021, at which both Debtor and Plaintiff appeared, Plaintiff's counsel stated that only one of the checks for $1,225 that Debtor had sent to the Family Court, prior to the issuance of the bench warrant, cleared while the other three checks had bounced.  *See* Mot. for Summ J., Ex. L ("Bench Warrant Hearing Transcript") ¶ 9; May 2021 Contempt Order ¶¶ 1–2.  Debtor admitted that sufficient funds were not available to cover the remaining three checks, but also testified he is employed with Cigna and makes approximately $125,000 annually.  *See* Bench Warrant Hearing Transcript ¶ 11; May 2021 Contempt Order ¶ 4.  When asked where the funds were, Debtor responded, "there are no funds," and he "would have to try to liquidate [his] 401(k)s"

which might have $10,000.  *See* Bench Warrant Hearing Transcript ¶ 11.  The Court noted

that Debtor had the "opportunity now since August" to send these checks, to which Debtor

again responded that "there's no money to give these people."  *See id.* ¶ 15.

On May 12, 2021, the Family Court entered a final memorandum and order finding

Debtor in contempt of the Court's prior Contempt Orders ("May 2021 Contempt Order").

*See* May 2021 Contempt Order ¶¶ 1–6.  The Court found that Debtor had no authority to

insert conditional language on the checks, *see id.* ¶ 2, and that Debtor "knowingly issued

fraudulent checks to the Court" as no money was ever available to pay the amounts required.

*See id.* ¶ 4.  Finally, the May 2021 Contempt Order also required Debtor to liquidate his

401K account and pay all the proceeds to Plaintiff's counsel to apply towards the Marital

Obligation with certain conditions.  *See id.*

On June 9, 2021, the Debtor filed a voluntary petition under chapter 13 of Title 11 of the

United States Bankruptcy Code ("Bankruptcy Code").  *See* ECF 1 Voluntary Chapter 13

Petition ("Voluntary Petition").  On August 18, 2021, the Plaintiffs filed proofs of claim in

Debtor's case.  *See* Proof of Claim No. 17; Proof of Claim No. 18 (collectively, known as

"Proofs of Claim").  The Trust, as a creditor, filed Proof of Claim No. 17 for $174,451.79[5]

indicating the basis of the claim was a domestic support obligation that was created by the

PSA which required Debtor to pay back a portion of the Marital Obligation.  *See* Proof of

Claim No. 17 ¶¶ 1–4.  Plaintiff, as a creditor, filed an identical proof of claim pursuant to the

---

[5] The Proofs of Claim assert Debtor's domestic support obligation consists of: (i) $113,913.28 for the portion of the Marital Obligation owed to the Trust; (ii) $6,644.51 for "inappropriately withdrawing from a line of credit that reduced the Trust's recoupment upon the sale of the Marital Residence (which would have gone to [Plaintiff's] support)"; and (iii) counsel fees of $4,500; which were all included in the August 2020 Contempt Order.  *See* Proofs of Claim, Ex. A ¶ 2.  Separately, the Proofs of Claim assert $50,619 for legal fees and costs incurred in connection with the enforcement of this Marital Obligation are part of Debtor's domestic support obligation; however, this request for counsel fees was held in abeyance by the Family Court pending Debtor's replacement of the checks.  *See* Proofs of Claim, Ex. A ¶ 2; Mot. for Summ. J. ¶ 33 n. 30.  The hearing never occurred because of this instant bankruptcy filing.  *See* Mot. for Summ. J. ¶ 33 n. 30.

Marital Obligation, *see* Proof of Claim No. 18, "out of an abundance of caution," *see* Mot.

for Summ. J. ¶ 35.

On November 15, 2021, Debtor objected to both proofs of claim primarily disputing

Plaintiffs' categorization of the claims as domestic support obligations.  *See* ECF 37 Obj. to

Proof of Claim 17; ECF 39 Obj. to Proof of Claim 18 (collectively, known as "Objections").

Debtor also objected to the amounts owed, given that the August 2020 Contempt Order

ordered Debtor to pay $113,913.28 for his share of the Distribution, $6,644.51 for funds

withdrawn from the home equity line of credit, and $4,500 in attorney's fees for a total of

$121,832.79.  *See* Objections ¶ 6.  Debtor also disputes Plaintiffs' request for legal fees in the

amount of $50,619 because this amount was not authorized by the Family Court.  *See*

Objections ¶ 6.

On January 21, 2022, Debtor filed an adversary complaint against Plaintiffs seeking a

determination as to whether the alleged obligations claimed in the Proofs of Claim were

dischargeable pursuant to Section 523(a) and 11 U.S.C. § 1328.  ECF 70 Comp. ("Debtor's

Comp.") ¶ 1.  On March 17, 2022, Plaintiffs filed an adversary complaint against Debtor

seeking a determination as to whether the Marital Obligation reflected in the Proofs of Claim

was non-dischargeable pursuant to Sections 523(a)(2)(A), (a)(2)(B), (a)(4), (a)(6), and (a)(5).

*See* Adv. ECF 1 Comp. ("Plaintiffs' Comp.") ¶ 1.

The Court entered an order consolidating both adversary proceedings ("Consolidation

Order") on June 8, 2022, *see* Adv. ECF 11, 15 Consolidation Order, and entered a

consolidated pre-trial order on June 10, 2022 ("Consolidated Pre-Trial Order"), *see* Adv.

ECF 12, 16 Consolidated Pre-Trial Order.  The Court's Consolidated Pre-Trial Order

provided, *inter alia*, that "all motions to amend the pleadings, or for summary judgment,

shall be filed on or before October 17, 2022," *see* Consolidated Pre-Trial Order ¶ 3, and a

motion for summary judgment "shall include a separate statement of those material facts that

the movant contends are not in dispute with supporting citations to the record." *See*

Consolidated Pre-Trial Order ¶ 3 n.3.  A "[f]ailure to comply with this requirement shall be

grounds for summary denial of the motion." *See id.*

On October 17, 2022, Plaintiffs filed this instant motion for summary judgment ("Motion

for Summary Judgment"),[6] requesting summary judgment on all five counts described in

Plaintiffs' adversary complaint.  Count I alleges the Marital Obligation is non-dischargeable

under Section 523(a)(2)(A), *see* Mot. for Summ. J. ¶ 9, and Count II alleges the Marital

Obligation is non-dischargeable under Section 523(a)(2)(B), *see id.* ¶¶ 19–26.  Count III

alleges the Marital Obligation is non-dischargeable under Section 523(a)(4) because Debtor

engaged in fraud while acting as a purported trustee to the Trust.  *See id.* ¶ 26.  Count IV

alleges the Marital Obligation is non-dischargeable under Section 523(a)(6), *see id.* ¶ 30, and

Count V alleges the Marital Obligation is non-dischargeable under Section 523(a)(5).  *See id.*

¶ 34.

Debtor's original response to the Motion for Summary Judgment was due on November

7, 2022, Adv. ECF 26, 42 Notice ¶ 1, but Debtor did not file a response.  Debtor filed a

motion to extend the time to file a response on November 14, 2022, seven days after the

original response was due, Adv. ECF 28, 44 Motion to Extend Time to File a Response to

Plaintiffs' Motion for Summary Judgment, which this Court granted on November 18, 2022,

*see* Adv. ECF 29, 45 Order ("Order").  The Court's order allowed Debtor's counsel to "file a

response on or before November 28, 2022."  Order ¶ 1.  In lieu of the response permitted by

---

[6] The motion was filed in each of the respective consolidated cases, Case No. 20-00005 and Case No. 22-00026.

the Court, Debtor filed a cross-motion for summary judgment ("Cross-Motion") on

November 28, 2022, *see* Adv. ECF 39, 47 Cross-Motion for Partial Summary Judgment

("Debtor's Cross-Motion"), and a memorandum of law in support, *see* Adv. ECF 49 Mem. of

Law in Opposition to Plaintiffs' Motion for Summary Judgment ("Mem. of Law Opposing

Mot. for Summ. J.").

On December 7, 2022, Plaintiff filed a motion to strike or summarily deny Debtor's

Cross-Motion. *See* Adv. ECF 51 Plaintiffs' Motion to Strike or Summarily Deny Debtor's

Motion for Partial Summary Judgment ("Mot. to Strike or Summarily Deny"). Plaintiff

argues Debtor's Cross-Motion is procedurally defective because pursuant to Local Rule

7005-1 Debtor's responses were due on November 7, 2022, and the Court's Order only

permitted a response, not a cross-motion for summary judgment. *See* Mot. to Strike or

Summarily Deny ¶ 2. *See also* Order ¶ 1. Plaintiff further notes she did not consent to the

requested extension, *see* Mot. to Strike or Summarily Deny ¶ 2, and will be prejudiced by the

late filing because of the further delay and additional fees and costs to prepare a response, *see*

*id.* ¶ 3. As such, this matter is ripe for disposition.

## III.    DISCUSSION

For the reasons described more fully below, the Court concludes that Plaintiff's statement

of undisputed facts and supporting evidence establish that there is no genuine dispute that the

Marital Obligation is non-dischargeable pursuant to Section 523(a)(5), as is Debtor's court-

ordered obligation to pay Plaintiff's legal fees. Therefore, summary judgment for Plaintiffs

is granted in part as to Count V in the modified amount of $118,413.28 plus any additional

legal fees the Family Court may award Plaintiff, and Debtor's Cross-Motion is denied.

### A.  Applicable Legal Principles

### a. Federal Rule of Civil Procedure 56

Pursuant to Federal Rule of Civil Procedure 56(a) ("Rule 56"), applicable to bankruptcy

adversary proceedings through Federal Rule of Bankruptcy Procedure 7056, "[t]he court

shall grant summary judgment if the movant shows there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P.

56(a).  A genuine issue of material fact arises when there is "sufficient evidence [] that would

permit a reasonable fact finder to return a verdict for the non-moving party." *See Odom v.*

*Philadelphia Parking Auth. (In re Odom)*, 571 B.R. 687, 692 (Bankr. E.D. Pa. 2017).  Rule

56(c)(1) provides that:

> a party asserting that a fact cannot be or is genuinely disputed must support the
> assertion by: (A) citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits or
> declarations, stipulations … admissions, interrogatory answers, or other materials;
> or (B) showing that the materials cited do not establish the absence or presence of
> a genuine dispute, or that an adverse party cannot produce admissible evidence to
> support the fact.

*See* Fed. R. Civ. P. 56(c)(1)(A)–(B).  Moreover, "[t]he court need consider only the cited

materials, but it may consider other materials on the record."  *See* Fed. R. Civ. P. 56(c)(3).

The moving party has the burden of showing there is no genuine issue of material fact.

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant meets its initial

burden, the non-moving party must generally look beyond the pleadings and provide

counterevidence indicating there is a genuine issue to be resolved at trial.  *See Celotex Corp.*,

477 U.S. at 324.

Ultimately, in resolving a motion for summary judgment, the Court must draw all

reasonable inferences in favor of the non-moving party, *see In re Odom*, 571 B.R. at 692,

using only admissible evidence, *see Prince v. BAC Home Loans Servicing, LP*, 2018 WL

4154947, at *3 (E.D. Pa. Aug. 30, 2018) (citation omitted).  Nonetheless, "[t]he line between

reasonable inferences and impermissible speculation is often 'thin,'" but critical because an

inference based on speculation or conjecture does not create a material factual dispute.  *See*

*Prince*, 2018 WL 4154947, at *2.

Where, as here, the non-moving party fails to properly address or support an assertion of

fact, Rule 56(e) applies.  *See Rosado v. Smith*, 2022 WL 225564, at *1–2 (E.D. Pa. Jan. 26,

2022).  Pursuant to Rule 56(e):

> [i]f a party fails to properly support an assertion of fact or fails to properly address
> another party's assertion of fact as required by Rule 56(c), the court may: (1) give
> an opportunity to properly support or address the fact; (2) consider the fact
> undisputed for purposes of the motion; (3) grant summary judgment if the motion
> and supporting materials – including the facts considered undisputed – show that
> the movant is entitled to it; or (4) issue any other appropriate order.

*See* Fed. R. Civ. P. 56(e).

Here, Debtor was on notice since October 17, 2022, that Plaintiff was seeking summary

judgment based upon various provisions of 11 U.S.C. § 523.  *See* Adv. ECF 26, 42 Notice.

As described *supra*, the Court gave Debtor until November 28, 2022, to file a response

contesting Plaintiff's Summary Judgment Motion with a statement of undisputed facts.

Despite having additional time to do so, in lieu of the permitted response, Debtor filed his

Cross-Motion but without including a separate statement of undisputed facts or addressing

Plaintiffs' statement of undisputed facts.

Debtor's Cross-Motion has two procedural defects.  First, by seeking relief in the form of

a cross-motion, Debtor did not comply with this Court's Order or with L.B.R. 7005-1.  *See In*

*re Jacobs*, 401 B.R. 161, 173 n.14 (Bankr. E.D. Pa. 2009) (finding cross-motion suffered

from two procedural defects related to timeliness and L.B.R. 7005-1).  Second, Debtor's

Cross-Motion was untimely as it failed to comply with this Court's Consolidated Pre-Trial

Order.  Debtor's Cross Motion was filed on November 28, 2022, past the due date of October

17, 2022, and it contained no separate statement of undisputed material facts with citations to the record.  Consequently, Debtor's Cross-Motion is denied as untimely and as failing to comply with the requirement to include a statement of undisputed material facts in violation of the pre-trial order.  *See Serino v. Prudential Ins. Co. of Am.*, 706 F. Supp. 2d 584, 586–87 (M.D. Pa. 2009).

Having disposed of the Cross-Motion, the Court will deem as undisputed the facts set forth in Plaintiffs' statement of undisputed facts, *see* Mot. for Summ. J. ¶¶ 1–7, for purposes of the Motion for Summary Judgment as Rule 56(e)(2) permits it to do and will proceed to assess whether those undisputed facts and supporting materials establish that the Marital Obligation is non-dischargeable as a matter of law.

### b.  Section 523(a)(5) and Chapter 13

Upon completion of all plan payments, a chapter 13 debtor is entitled to discharge all debts except those set out in 11 U.S.C. § 1328(a) ("Section 1328(a)"), such as any debt of the kind specified in Section 523(a)(5).  *See* 11 U.S.C. § 1328(a)(2).  Section 523(a)(5) provides that any debt for a domestic support obligation is not dischargeable.  Although domestic support obligations pursuant to Section 523(a)(5) are excepted from chapter 13 discharge, debts for divorce-related property settlements are dischargeable under chapter 13.  *See* 11 U.S.C. § 1328(a)(2); *In re Redfearn*, 608 B.R. 556, 560 (Bankr. D.N.M. 2019) (while property settlement obligations are non-dischargeable under § 523(a)(15) in chapter 7 cases, they are dischargeable in chapter 13 cases).

Whether a debt constitutes a domestic support obligation is a question of federal law.  *See In re Readfearn*, 608 B.R. at 560–61.  The Bankruptcy Code defines "domestic support obligation" as

16

a debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law…that is – (A) owed to or recoverable by – (i) a spouse, former spouse, or child of the debtor…or (ii) a governmental unit; (B) in the nature of alimony, maintenance, or support…of such spouse, former spouse, or child of the debtor…without regard to whether such debt is expressly so designated; (C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of (i) a separation agreement, divorce decree, or property settlement agreement; (ii) an order of a court of record; or (iii) a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and (D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor…for the purpose of collecting the debt.

11 U.S.C. § 101(14A)(A)–(D).

In sum, to qualify as a domestic support obligation pursuant to Section 523(a)(5): the debt must be (i) "owed to or recoverable by" a governmental unit or a person with a specific relationship to the Debtor such as a spouse, former spouse, or child of the Debtor; (ii) the underlying obligation must be in the nature of alimony, maintenance, or support of such person; (iii) the obligation must arise from an agreement, court order, or as otherwise defined; and (iv) the debt must not be assigned to a non-governmental entity unless voluntarily done by the spouse, former spouse, or child of the Debtor.  *See* 11 U.S.C. § 101(14A)(A)–(D); *In re Price*, 545 B.R. 114, 118 (Bankr. W.D. Pa. 2015).

### B.  There is no genuine dispute that the Marital Obligation is a non-dischargeable domestic support obligation under Section 523(a)(5).

Ultimately, the facts set forth in Plaintiffs' statement of undisputed facts associated with the Motion for Summary Judgment and related evidence establish that there is no genuine dispute that the Marital Obligation is a non-dischargeable domestic support obligation under Section 523(a)(5) because they establish that (a) Debtor's Marital Obligation is in the nature of domestic support; and (b) the Marital Obligation arises from the PSA and has not been assigned to a non-governmental entity.

Based on the undisputed facts, the Court finds that the non-dischargeable portion of

Debtor's Marital Obligation includes the $113,913.28 Debtor was ordered to repay the Trust

pursuant to the PSA, the $4,500 in attorneys' fees Debtor was ordered to pay directly to the

Trust in the Family Court's August 2020 Contempt Order for a total domestic support

obligation amount of $118,413.28, plus any additional legal fees the Family Court may order

Debtor to pay Plaintiff pursuant to the enforcement provision in the PSA.  As such, the

Court's analysis as to the dischargeability of the Marital Obligation under Section 523(a)(5)

relates only to Debtor's obligation to repay the Trust and any legal fees he is ordered to repay

Plaintiff that are related to his non-compliance with that obligation.

### a. The Marital Obligation owed to Plaintiff is in the nature of domestic support.

First, Debtor's contention that the Marital Obligation cannot be owed to Plaintiff because

it is payable to the Trust is unavailing, *see* Debtor's Cross Motion ¶ 10, because "payment of

the support … need not be paid directly to [Plaintiff]," to constitute a non-dischargeable

domestic support obligation under Section 523(a)(5), *see In re Price*, 545 B.R. at 118.  *See*

*also In re Montgomery*, 310 B.R. 169, 178 (Bankr. C.D. Cal. 2004).

Obligations payable to entities other than a debtor's spouse are nonetheless considered

'owed' to a former spouse for the purposes of Section 523(a)(5) where the obligation is

structured and designed in the nature of that spouse's and/or their children's support for

purposes of the Bankruptcy Code.  *See, e.g.*, *In re Gianakas*, 917 F.2d 759, 764 (3d Cir.

1990) (finding that a debtor's obligation to pay a mortgage was in the nature of support for

his former spouse and ruled non-dischargeable under Section 523(a)(5)); *In re Price*, 545

B.R. 114, 121–23 (Bankr. W.D. Pa. 2015) (finding that "the mortgage obligation's function

of providing a necessity to the minor children in the form of their primary residence"

18

indicated the debtor's obligation to pay the mortgage was in the nature of support and thus constituted a non-dischargeable domestic support obligation); *In re Froncillo*, 296 B.R. 138, 144–45 (Bankr. W.D. Pa. 2003), *subsequently aff'd*, 155 F. App'x 608 (3d Cir. 2005) (finding that debtor's obligation to pay amounts due to various credit card companies was "owed" to spouse and non-dischargeable because debtor's obligation was structured as support).  Under the PSA, Debtor agreed to repay a portion of the Distribution to the Trust "in the amount of not less than $1,225.00 per month" until satisfied, in the event the sale of the Property did not fully repay the Distribution, in lieu of alimony, understanding that per the terms of the PSA, those payments would be used for Plaintiff's support in the future.  *See* PSA ¶ 10.  In the Debtor's own words, "rather than alimony, [he] pay[s] the [T]rust."  *See* Contempt Hearing Transcript ¶ 10.  Given the language of the PSA and Plaintiff's acceptance of this repayment in lieu of traditional alimony, the Marital Obligation is structured as support for Plaintiff, and therefore, the underlying obligation is considered owed to or recoverable by Plaintiff.

Second, the parties intended the obligation described in Section 12 of the PSA to be in the nature of alimony, maintenance, or support.  "[W]hether an obligation is in the nature of alimony, maintenance or support, as distinguished from a property settlement,[7] depends on

---

[7] By way of background, "alimony, maintenance, and support" generally refer to obligations of one spouse to the dependent spouse to provide continuing financial support to enable the dependent spouse to meet his or her basic needs and/or maintain his or her pre-separation standard of living.  *See e.g., Tyndall v. Tyndall (In re Tyndall),* 360 B.R. 68, 71–72 (Bankr. D. Del. 2007) (debtor's obligation to make regular payments to his former spouse in lieu of her interest in debtor's business was contemplated to allow former spouse to meet necessary living expenses and was found to serve a support function); *Marker v. Marker (In re Marker),* 139 B.R. 615, 622–23 (Bankr. W.D. Pa. 1992) (finding debtor's obligation to pay former spouse her share of debtor's business in one lump sum by a certain date constituted support and maintenance under federal law because circumstances reflected it was intended to enable debtor's former spouse to obtain life's daily necessities and maintain the marital residence); *Pollock v. Pollock (In re Pollock),* 150 B.R. 584, 589 (Bankr. M.D. Pa. 1992) (debtor's assumption of obligation to pay second mortgage on marital residence was considered support because it was intended to facilitate maintenance of dependent former spouse's housing); *Smith v. Smith,* 904 A.2d 15, 20 (Pa. Super. Ct. 2006) ("the purpose of alimony is to ensure that the reasonable needs of the person who is unable to support himself or herself…are met. Alimony is based upon reasonable needs in accordance with the lifestyle and standard of living established by the parties during the marriage…") (citations omitted).

… the intent of the parties at the time of the [PSA]."[8]  *See In re Gianakas*, 917 F.2d at 762

(citation omitted).  Ultimately, courts must look beyond the label attached to an obligation to

examine its true nature.  *Id.*  The Third Circuit Court of Appeals ("Third Circuit") directs

courts to examine the parties' intent using three principal indicators: (i) the language and

substance of the agreement; (ii) the parties' financial circumstances; and (iii) the function of

the obligation.  *See id.*  Specifically, the Third Circuit explained:

> [f]irst, the court must examine the language and substance of the
> agreement in the context of surrounding circumstances, using
> extrinsic evidence if necessary. However, it is likely that 'neither
> the parties nor the divorce court contemplated the effect of a
> subsequent bankruptcy when the obligation arose. Therefore, the
> parties and the state courts may not have focused on whether a
> particular obligation was to serve as support or as a property
> settlement unrelated to support. As the Pennsylvania Superior
> Court noted, even an obligation designated as a property settlement
> may be related to support because state courts often will adjust
> alimony awards depending on the nature and amount of marital
> assets available for distribution. In fact, 'property division often
> achieves the same goal as alimony, *i.e.,* support.'
>
> Because the language of the agreement alone may not provide a
> sufficiently conclusive answer as to the nature of an obligation, the
> second indicator to which we must look to assist in ascertaining the
> parties' intent is the parties' financial circumstances at the time of

---

In contrast, property settlements stemming from the division of marital assets in divorce proceedings without regard for either spouse's need for financial support are considered to be in the nature of equitable distribution.  *See e.g., Shirey v. Shirey,* No. 97-CV-7818, 1998 WL 107031, at *4–5 (E.D. Pa. Mar. 11, 1998) (finding debtor's obligation to compensate his former spouse for rental value of jointly-owned property where debtor resided post-separation without paying mortgage to be in the nature of equitable distribution due to the state court's lack of consideration for any financial need of the former spouse in imposing the obligation); *Mannix v. Mannix (In re Mannix),* 303 B.R. 587, 594–95 (Bankr. M.D. Pa. 2003) (debtor's obligation to reimburse his former spouse for a loan used to pay creditors of debtor's business did not constitute alimony, maintenance, or support as demonstrated by the lack of evidence that the former spouse would be unable to meet her needs in the absence of debtor's reimbursement for and further assumption of the loan); *Rankin v. Alloway (In re Alloway),* 37 B.R. 420, 426 (Bankr. E.D. Pa. 1984) ("unless…the debt is more akin to alimony, maintenance, or support rather than a mere distribution of property, the debt will be discharged.").

[8] Additionally, in *Gianakas v. Gianakas (In re Gianakas),* 917 F.2d 759 (3d Cir 1990), the Third Circuit Court of Appeals declared that "whether the obligation is in the nature of alimony, maintenance or support for purposes of the Bankruptcy Code is a question of federal, not state, law." 917 F.2d at 762.  Accordingly, a debt could still be "in the nature of support" even though it would not legally qualify as alimony or support under state law.  *Id.*  That said, it is important to note that "there is no federal domestic relations law, nor could Congress have intended to transform the bankruptcy court into a federal divorce forum." *Buccino v. Buccino,* 580 A.2d 13, 17 (Pa. Super. Ct. 1990).

the settlement. The facts that one spouse had custody of minor
children, was not employed, or was employed in a less
remunerative position than the other spouse are aspects of the
parties' financial circumstances at the time the obligation was
fixed which shed light on the inquiry into the nature of the
obligation as support.

Third, the court should examine the function served by the obligation at the time
of the divorce or settlement. An obligation that serves to maintain daily
necessities such as food, housing and transportation is indicative of a debt
intended to be in the nature of support.

*In re Gianakas*, 917 F.2d at 762–63 (citations omitted).

Based upon the foregoing, the Court will review the language and substance of the PSA,

the parties' financial circumstances at the time of the PSA, and the function of the obligation

payable to the Trust.

> **i. The language and substance of the PSA demonstrate that the
> Marital Obligation is in the nature of domestic support.**

First, the Court examines the language and substance of the PSA in the context of the

surrounding circumstances. *See In re Gianakas*, 917 F.2d at 762–63. Section 12 of the PSA

provides, in relevant part, that:

The parties acknowledge and agree that by accepting these funds they created a
marital debt to the Trust which is subject to equitable distribution. The parties
further acknowledge that as a beneficiary to the Trust, the repayment of the funds
will be applied toward [Plaintiff's] support in the future.

*See* PSA ¶ 10.

The Court must parse the parties' characterization further to determine whether the

evidence reflects no genuine dispute regarding their true intent in crafting this Marital

Obligation in the PSA. *See In re Gianakas*, 917 F.2d at 762–63. Under appropriate

circumstances, an obligation can be in the nature of support despite the label provided to it in

an agreement or divorce decree. *See In re Froncillo*, 296 B.R. at 143–44. Thus, while the

PSA initially labels the Marital Obligation as an equitable distribution, it clearly states the

21

parties' intention that any repayment of the Marital Obligation to the Trust is to be used for the Plaintiff's support. Therefore, the PSA's substantive description of the purpose of the Marital Obligation demonstrates that the Marital Obligation was intended to be in the nature of domestic support.

> ### ii. Plaintiff's subordinate financial status at the time the Marital Obligation was incurred suggests that the Marital Obligation was intended to be in the nature of domestic support.

Second, because the language of the agreement alone may not provide a sufficiently conclusive answer as to the nature of an obligation, the Court also looks to the parties' financial circumstances at the time of the agreement. *See In re Gianakas*, 917 F.2d at 762–63; *In re Froncillo*, 296 B.R. at 144. As mentioned, the fact that one spouse had custody of minor children, was not employed, or was employed in a less remunerative position than the other spouse are aspects of the parties' financial circumstances that shed light on the nature of the obligation. *See In re Gianakas*, 917 F.2d at 762–63. The PSA recognized Debtor's income for 2016 was $135,000 compared to Plaintiff's income of $16.60/hour. *See* PSA ¶¶ 13–14. An hourly rate of $16.60/hour, even working a full-time 40 hour/week job, would leave Plaintiff with around $34,528/year, significantly less than Debtor. The PSA further states that "[Debtor] recognizes that [Plaintiff's] income may not be sufficient to reasonably cover" expenses for her and her children's basic necessities, *see* PSA ¶ 13. Looking at these facts in the light most favorable to Debtor, the PSA indicates that Plaintiff was in an inferior financial position than Debtor at the time the PSA was executed and her income alone was not sufficient to care for their two minor children as well as her individual expenses and household expenses such as the mortgage and utilities, which Debtor was charged with

paying while he remained in the marital residence.[9]  Accordingly, these factors weigh in favor of finding that, given Plaintiff's subordinate financial status, Debtor's Marital Obligation to pay monthly payments of $1,225 on account of the Distribution was intended to be in the nature of domestic support to help allow Plaintiff to meet her and her children's needs.

### iii.   The function of the Marital Obligation is for Plaintiff's benefit and support.

Finally, the Court examines the function served by the obligation at the time of the divorce or settlement by considering the following factors: (1) the labels in the agreement or court order; (2) the income and needs of the parties at the time the obligation became fixed; (3) the amount and outcome of property division; (4) whether the obligation terminates on the obligee's death or remarriage or on emancipation of children; (5) the number and frequency of payments; (6) waiver of alimony or support rights in the agreement; (7) availability of state court procedures to modify or enforce the obligation through the contempt remedy; and (8) the tax treatment of the obligation.  *See In re Miller*, 501 B.R. 266, 282 (Bankr. E.D. Pa. 2013) (citing 4 Collier ¶ 523.11[6][a]–[h]).  Upon consideration of these factors, the Court finds Debtor's Marital Obligation functions as a domestic support obligation under Section 523(a)(5) for five reasons.

First, as discussed *supra*, *see* (B)(a)(i), the substantive language in the PSA explicitly states that the purpose of repayment of the Marital Obligation is for "[Plaintiff's] support in the future."  PSA ¶ 10.

---

[9] The financial disclosures attached to the Post-Nuptial Agreement, executed in 2013, also indicate that Plaintiff held no personal assets while Debtor held both joint and personal assets.

Second, Debtor repeatedly testified that the parties agreed to the Marital Obligation in lieu of traditional alimony and that it was to be used for the domestic support of Plaintiff and their children.  In Debtor's own words:

- "we agreed to the master [sic] settlement agreement rather than alimony; so [Plaintiff] waived alimony . . . [I] pay the trust fund back instead."  Contempt Hearing Transcript ¶ 9.
- "So she waives alimony.  I had offered her about $120,000 worth of alimony, okay, over ten years or eight years."  *Id*. ¶¶ 9–10.
- "So, in essence, I'm going to pay, I think I called it, 120,000 [sic] to the trust. So rather than alimony, I pay the trust."  *Id*. ¶ 10.
- "With the trust fund, there's a reason [Plaintiff] has a trust fund. She needs to be cared for … I felt rather than alimony giving her money directly to her, pay the trust fund, and they [sic] would take care of her and the children."  *Id*. ¶ 16.

Because "the substance of the award should prevail, not its form," *see In re Rogowski*, 462 B.R. 435, 444 (Bankr. E.D.N.Y. 2011), the Court is persuaded that Debtor, at the time of the agreement, believed that his Marital Obligation served as domestic support for Plaintiff and their children.

Third, Plaintiff's conduct, by repeatedly seeking to enforce Debtor's Marital Obligation through contempt proceedings in the Family Court, supports the finding that Debtor's obligation is in the nature of domestic support. *See In re Federer*, 2004 WL 231008, at * 3–4 (Bankr. E.D. Pa. Jan. 9, 2004) (finding parties' conduct supported view award was alimony because ex-wife commenced multiple contempt proceedings to secure payment).  Plaintiff commenced multiple contempt proceedings against Debtor, which culminated by the Family Court holding Debtor in contempt for his failure to comply with four orders directing him to fulfill his Marital Obligation and directing Debtor to liquidate his 401K to be applied towards his Marital Obligation.  *See* May 2021 Contempt Order ¶ 5.  The availability and repeated application of enforcement and contempt remedies to force Debtor to pay his Marital

24

Obligation supports a finding that Debtor's Marital Obligation was intended to function as domestic support.

Fourth, as discussed *supra*, *see* (B)(a)(ii), the PSA reflects Plaintiff's need for additional support from Debtor given that the parties recognized Plaintiff's income alone "may not be sufficient to reasonably cover" expenses for her and their children, *see* PSA ¶ 13, thus further indicating the Marital Obligation functions as a form of support.

Finally, the number and frequency of payments Debtor is required to make pursuant to the PSA further weighs in favor of finding that the Marital Obligation has the "traditional characteristic[s] of support." *See In re Carrigg*, 14 B.R. 658, 662 (Bankr. D.S.C. 1981). Because Debtor is to make periodic payments of $1,225.00/month until his obligation is satisfied, *see* PSA ¶ 10, and Plaintiff's earnings alone are insufficient to cover her and their children's monthly expenses, *see supra* (B)(a)(ii), Debtor's Marital Obligation is in the nature of alimony, maintenance, or support for Plaintiff and their children. *See In re Whitnall*, 305 B.R. 854, 860–61 (Bankr. E.D. Wisc. 2004); *In re Carrigg*, 14 B.R. at 662.

Based on the foregoing discussed *supra* (B)(a)(i)–(iii), the Court concludes that there is no genuine dispute that the parties intended the Marital Obligation to be in the nature of alimony, maintenance, or support for purposes of Section 523(a)(5).

### b. The Marital Obligation arises from the Property Settlement Agreement and was not assigned to a non-governmental entity.

The third factor required to establish that a debt constitutes a domestic support obligation is that the debt was created by a separation agreement or court order. *See In re Price*, 545 B.R. at 122. As discussed *supra*, Debtor's obligation to repay the Distribution was created by provisions within the Post-Nuptial Agreement, later adopted by the PSA, which was incorporated into the parties' Divorce Decree. Accordingly, Plaintiff has satisfied this factor.

25

Plaintiff has also established the fourth factor, which requires the debt not be assigned to a non-governmental entity unless it is assigned voluntarily by the former spouse for the purpose of collecting the debt.  *See In re Price*, 545 B.R. at 122–23.  There is no basis to conclude that Plaintiff assigned the Marital Obligation to a non-governmental entity since its inception and, as such, the Court finds this factor satisfied.

### c.  The $4,500 award for attorneys' fees and any additional legal fee awards also are non-dischargeable under Section 523(a)(5) as a domestic support obligation.

Finally, viewing the inclusion of attorneys' fees in connection with the Family Court's findings as to the Debtor's Marital Obligation and the enforcement of such obligation in its August 2020 Contempt Order, the Court finds Plaintiff's award of $4,500 in attorneys' fees and any subsequent legal fees the Family Court may award are non-dischargeable as a domestic support obligation.[10]  "It is well-settled that attorneys' fees awarded to a spouse in connection with a divorce [or enforcement or custody] proceeding are domestic support obligations within the meaning of section 101(14A)" which are non-dischargeable pursuant to Section 523(a)(5).  *See, e.g.*, *In re Kalsi*, 631 B.R. 369, 371 (Bankr. S.D.N.Y. 2021); *In re LaSpina*, 611 B.R. 219, 227, 234–35 (Bankr. E.D. Pa. 2020).  Because the Family Court ordered Debtor to pay $4,500 in attorneys' fees to the Trust knowing that the Trust provides support to Plaintiff as a beneficiary in connection with the August 2020 Contempt Order that ordered Debtor to comply with his Marital Obligation, the Court finds that (i) the fee award is owed to Plaintiff for the purposes of Section 523(a)(5); (ii) the Family Court intended this fee award to be in the nature of support; (iii) Debtor's obligation to pay $4,500 in attorneys'

---

[10] Because the additional amount of $50,619 in attorneys' fees Plaintiffs requested in their Proofs of Claim has not been determined by the Family Court to be owed to Hundt as part of the contempt and enforcement proceedings, this Court will defer to the Family Court for the determination of the appropriate amount of legal fees.

fees was created by the Family Court's August 2020 Contempt Order; and (iv) there is no

basis to conclude Plaintiff assigned this award to a non-governmental entity. *See In re*

*Stamp*, 626 B.R. 397, 404–05 (Bankr. E.D. Pa. 2021) (finding fee award non-dischargeable

as domestic support obligation because it was owed to Debtor's former spouse, established in

a custody order, and had not been assigned).  Accordingly, there is no genuine dispute that an

award to Plaintiff for attorneys' fees satisfies the criteria required to find that the award

constitutes a non-dischargeable domestic support obligation.

## IV.    CONCLUSION

For the reasons set forth above, the Court finds that Debtor's Marital Obligation to

Plaintiff created by Section 12 of the PSA and attorney fees awarded in connection with

enforcement of that obligation constitute a domestic support obligation and, therefore, shall

be held non-dischargeable pursuant to 11 U.S.C. § 523(a)(5) in the total amount of

$118,413.28 plus any additional legal fees awarded by the Family Court, and summary

judgment is granted to Plaintiffs in part, as to Count V.[11]

Date: January 31, 2023                          _____
                                                Honorable Ashely M. Chan
                                                United States Bankruptcy Judge

---

[11] It is unclear to the Court whether Plaintiffs seek to have the Court determine that the $6,644.51 obligation imposed upon the Debtor by the Family Court to repay the Trust for withdrawals on the Property's home equity line of credit is non-dischargeable through the Motion for Summary Judgment.  To the extent that the Motion for Summary Judgment does seek to have the $6,644.51 obligation declared non-dischargeable, the Court must deny the Motion for Summary Judgment in part.  As mentioned *supra*, Plaintiffs' Proofs of Claim also included $6,644.51 that Debtor was ordered to repay to the Trust after having withdrawn this amount from a home equity line of credit. The relationship between the home equity line of credit and Debtor's Marital Obligation under Section 12 of the PSA is not totally apparent from the Motion for Summary Judgment and supporting materials, and neither are the Family Court's reasons for imposing this obligation on Debtor.  As such, the Court will not speculate as to whether this portion may be a non-dischargeable domestic support obligation without additional factual support.  Similarly, there remain genuine disputes of fact as to the circumstances surrounding the withdrawals from the home equity line of credit and whether Debtor withdrew these funds under false pretenses, obtained them through a material misrepresentation, obtained the funds through larceny, or obtained the funds through a willful and malicious injury to Plaintiffs pursuant to Sections 523(a)(2)(A), 523(a)(2)(B), 523(a)(4), and 523(a)(6).  Therefore, the Court will not grant summary judgment as to the home equity line of credit pursuant to Counts I through IV.